UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIGHT POWER SPORTS, LLC,
a Michigan limited liability company,

    Plaintiff,

-vs-                                          Case No. 09-11545
                                              Hon: AVERN COHN

BRP US INC.,
a Deleware corporation,

    Defendants.
_____/

**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S**

**MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

      This is a Michigan Motor Vehicle Dealer Act (Dealer Act) case under MICH. COMP. LAWS § 445.1561 et seq.  Defendant BRP, US Inc. (BRP) removed the case to this court based upon diversity of citizenship under 28 U.S.C. § 1332.  Plaintiff Bright Power Sports LLC (Bright) is a Michigan limited liability corporation involved in the retail sale of all terrain vehicles (ATVs).  BRP is a Delaware corporation with a principle place of business in Florida; it manufactures ATVs.  Bright and BRP entered into a dealer agreement under which Bright sold ATVs manufactured by BRP.  Bright claims that BRP violated the Dealer Act as well the terms of their contract by refusing to repurchase Bright's remaining inventory of BRP products when the dealer agreement was terminated.  The complaint is in three counts:

(I)   MICH. COMP. LAWS §§ 445.1571 and .1572 for failure to repurchase inventory at dealer acquisition costs,

(II)  Declaratory Judgment pursuant to MICH. COMP. LAWS § 445.1580(3), and

(III) Breach of Contract[1]

Now before the Court are Bright's motion for summary judgment as to counts I and II and BRP's motion for summary judgment as to all counts. Bright asserts that the Dealer Act requires the repurchase of all current model year vehicles and all financed noncurrent model year vehicles at the dealers' net acquisition costs. BRP asserts that none of the vehicles in question are current model year vehicles, that the Dealer Act does not require the repurchase of noncurrent model year vehicles purchased more than 120 days before termination of a dealer agreement, and that it has not breached any contractual obligation. For the reasons that follow the motions will be gratned in part and denied in part.

## II. ISSUES

### A. The Dealer Act

Michigan's Dealer Act governs the relationship between the manufacturers and dealers of new motor vehicles. The act defines new motor vehicle dealers,[2]

---

[1] BRP has moved for summary judgment on Bright's breach of contract claim. The Court finds that this claim is based on an allegation that BRP violated the Dealer Act and is wholly derivative of Bright's other claims. Because of its derivative nature, the Court will not address it as an independent claim.

[2] "'New motor vehicle dealer' means a person, including a distributor, who holds a dealer agreement granted by a manufacturer, distributor, or importer for the sale or distribution of its motor vehicles, who is engaged in the business of purchasing, selling, exchanging, or dealing in new motor vehicles and who has an established place of business in this state." MICH. COMP. LAWS § 445.1565(2).

manufacturers,[3] and motor vehicles.[4]  The parties do not dispute that, for purposes of the Dealer Act,  Bright was a new motor vehicle dealer, BRP a manufacturer, and the ATVs motor vehicles.

The Dealer Act requires manufacturers and distributors of new motor vehicles to repurchase certain types of inventory from dealers when dealer agreements are terminated.  The Dealer Act states:

> (1) Upon termination, cancellation, nonrenewal, or discontinuance of any dealer agreement, the new motor vehicle dealer shall be allowed fair and reasonable compensation by the manufacturer or distributor for the following:
> (a) All new current model year motor vehicle inventory purchased from the manufacturer or distributor, which has not been materially altered, substantially damaged, or driven for more than 300 miles and all new motor vehicle inventory not of the current model year which has not been materially altered, substantially damaged, or driven for more than 300 miles, provided the noncurrent model vehicles were purchased from the manufacturer or distributor and drafted on the dealer's financing source or paid for within 120 days of the effective date of the termination, cancellation, or nonrenewal.
> (b) Supplies and parts inventory purchased from the manufacturer or distributor and listed in the manufacturer's or distributor's current parts catalog.

---

[3] "'Manufacturer' means any person who manufactures or assembles new motor vehicles; or any distributor, factory branch, or factory representative." MICH. COMP. LAWS § 445.1564(2).

[4] "'Motor vehicle' means that term as defined in Section 33 of the Michigan vehicle code, 1949 PA 300, MCL 257.33, but does not include a bus, tractor, or farm equipment." MICH. COMP. LAWS § 445.1564(3).  "'Motor vehicle' means every vehicle that is self-propelled, but . . . does not include industrial equipment such as a forklift, front-end loader, or other construction equipment that is not subject to registration under this act.  Motor vehicle does not include an electric patrol vehicle being operated in compliance with the electric patrol vehicle act.  Motor vehicle does not include an electric personal assistive mobility device." MICH. COMP. LAWS § 257.33.

MICH. COMP. LAWS § 445.1571. The act does not distinguish between terminations initiated by a manufacturer or by a dealer.

Once a dealer agreement is terminated, the manufacturer is required to repurchase the new motor vehicles described above at the dealer's "net acquisition cost" and parts inventory at the amount stated in the manufacturer's "current parts price list." MICH. COMP. LAWS § 445.1572. A manufacturer is also required to pay interest at a rate of 12% for all payments not made within 90 days. Id. In addition, a manufacturer found liable under the act shall also be liable for "all court costs and reasonable attorney's fees incurred by the dealer." MICH. COMP. LAWS § 445.1580(4).

### B. Questions Presented

The motions for summary judgment present two questions which must be answered by the Court:

1. Were the ATVs remaining in Bright's inventory current or noncurrent model year vehicles?

2. If the ATVs were noncurrent model year vehicles, does the Dealer Act require BRP to repurchase them when they were purchased through Bright's financing source more than 120 days before the Dealer Agreement was terminated?

### III. FACTS

On December 6, 2007 Bright and BRP entered into a Recreational Products Dealer Agreement (Dealer Agreement) under which Bright became a dealer in ATVs manufactured by BRP. Bright's termination rights were set forth in the following contract clause:

> (19.3) This agreement may be terminated by DEALER for

> any or all of the Lines of Products for a material breach of
> this Agreement by BRP upon thirty (30) days prior written
> notice to BRP during which time BRP shall have the right to
> cure such material default or at any time without notice by
> mutual written consent of DEALER and BRP.

Pursuant to the Dealer Agreement, Bright purchased ATVs from BRP. The ATVs were purchased on credit through Bright's financing source.

On July 1, 2008, BRP launched its 2009 model year ATVs and began marketing them.

On November 10, 2008 Bright sent a letter to BRP purporting to terminate the dealer agreement. The letter stated in part "Bright hereby terminates its BRP dealer agreement for ATVs pursuant to the terms of said agreement and Michigan law." The letter also informed BRP of its obligation to repurchase the ATVs it had on hand under the Dealer Act. The letter did not assert a material breach by BRP.

On December 3, 2008 Bright's legal counsel sent a second letter to BRP regarding its termination of the dealer agreement. The letter stated in part: "On November 13, 2008 BRP US, Inc. received via certified mail [Bright's] request to terminate its BRP agreement with respect to ATVs. Accordingly, my client's termination date pursuant to contract is December 12, 2008." The letter also requested that BRP repurchase Bright's ATV inventory pursuant to the Dealer Act. Again, the letter did not assert a material breach by BRP.

On December 12, 2008 BRP's legal counsel replied to Bright, acknowledging receipt of Bright's letters and promised to review and respond to Bright's requests.

On January 9, 2009 Bright sent BRP a list of its inventory, which included 88 ATVs. All of the ATVs were of the 2008 model year and had invoice dates between

5

October 26, 2007 and April 28, 2008.

On February 4, 2009 BRP responded to Bright's repurchase demand by offering to repurchase Bright's ATV inventory at a reduced price. BRP offered to pay 80% of the purchase price for crated inventory and 75% of the purchase price for uncrated inventory.

Bright rejected BRP's repurchase offer and filed this case on March 19, 2009.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when the evidence submitted shows that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(a).  Accordingly, the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying what it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When a motion for summary judgment is properly made and supported, an opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). All facts and inferences should be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

### IV.  ANALYSIS

#### A. Date of Termination of the Dealer Agreement

Under the Dealer Act, a dealer's obligation to repurchase motor vehicles upon the

termination of a dealer agreement varies depending on whether or not the motor vehicles were of the current model year. Thus the date of termination must be established as a prerequisite to determining the status of the vehicles as current or noncurrent models.

Bright asserts that the letter it sent to BRP on November 12, 2008 terminated the dealer agreement between them. BRP counters by asserting that the dealership agreement was not terminated until February 4, 2009 when it consented to Bright's termination offer.

The dealership agreement between Bright and BRP specifically addressed Bright's termination rights. Bright was permitted to terminate the dealer agreement after 30 days notice if BRP committed a material breach. In the absence of a material breach, Bright could terminate the agreement at any time, but only with BRP's consent. Furthermore, the Dealer Act does not give a dealer the unilateral right to terminate a dealer agreement when such a right is not provided in the agreement itself.

The letters that Bright sent to BRP on November 12, 2009 and December 3, 2009 stated that Bright was terminating the dealer agreement pursuant to its contractual terms. However, these letters do not reference a material breach on the part of BRP which would have given Bright the right to unilaterally terminate the agreement. Bright has provided no evidence to suggest that a material breach occurred. Without some evidence of a material breach, Bright could not terminate the dealer agreement without BRP's consent.

BRP, relying on letters it sent to Bright, asserts that it did not consent to the termination until February 4, 2009. The first letter, dated December 12, 2009, confirmed BRP's acknowledgment of Bright's termination request, but stated that BRP would review Bright's requests and respond at a later date. BRP asserts that consent to terminate did

not occur until February 4, 2009 when it offered to repurchase Bright's inventory at a reduced price. This letter is the first document attributable to BRP that signals a willingness to terminate the dealer/manufacturer relationship.

Based on the evidence before the Court, no reasonable jury could find that the dealer agreement was terminated in 2008.[5] Bright has provided no evidence of a material breach by BRP or of mutual consent prior to January 1, 2009. As a result, there is no genuine issue of material fact as to the date of the termination of the agreement.

### B. Current Model Year Motor Vehicles

The term "current model year motor vehicle" is not defined in the Dealer Act. However, a manufacturer's obligations to repurchase vehicles at the termination of a dealer agreement vary depending on whether the vehicle is of the current model year or a noncurrent model year. Bright asserts that current model year motor vehicles are those whose model year corresponds to the current calendar year. Under this interpretation, 2008 model vehicles would be considered current model year vehicles for all of 2008, even if 2009 models had already been introduced. BRP asserts that current model year motor vehicles are those of the most recent model year which is available for sale from the manufacturer. Under this interpretation, 2008 model year vehicles cease to be of the current model year as soon as the 2009 models are introduced. There is no published authority construing this phrase.

---

[5] Even if a reasonable jury could find that the dealer agreement was terminated in 2008, it would not change the analysis with respect to Bright's motion. At summary judgment, all disputed facts must be construed in the favor of the non-moving party. Thus a termination date in 2009 would still apply with respect to Bright's motion because the date of termination would then be in dispute.

Because the agreement was terminated in 2009, there is also no material dispute as to the interpretation of the term current model year. The parties agree that all of the ATVs in Bright's inventory were of the 2008 model year. Even under Bright's more lenient interpretation, those vehicles were not of the current model year when the agreement was terminated in 2009. Therefore, the statutory rules for non-current model year motor vehicles apply to all of the vehicles at issue in this case.

### C. Noncurrent Model Year Motor Vehicles

**1.**

In order for a dealer to receive full reimbursement for noncurrent model year motor vehicles (noncurrent models) upon the termination of a dealer agreement, several elements must be met. First the noncurrent model must still be "new" and cannot be "materially altered, substantially damaged, or driven more than 300 miles." MICH. COMP. LAWS § 445.1571(1)(a). Second, the noncurrent model must have been purchased from the manufacturer or distributor from whom repurchase is demanded. Id. These two requirements speak for themselves and are not in dispute.

The parties dispute the meaning of the final element: "and drafted on the dealer's financing source or paid for within 120 days." Id. Bright asserts that the manufacturer is obligated to repurchase all noncurrent models which are financed by the dealer as well as any noncurrent models purchased outright by the dealer within 120 days. In contrast, BRP asserts that the 120 day limitation applies to all noncurrent models obtained by a dealer, whether financed or purchased outright. The term has not been defined by any state or federal court.

9

On its face, the statute is unclear. The 120 day limitation could reasonably be interpreted to apply only to the immediately preceding element, noncurrent models paid for by the dealer. Alternatively, it could reasonably be interpreted to apply to the entire preceding clause, including both noncurrent model year vehicles that are either paid for outright or financed. While both interpretations may be reasonable, Bright's is more persuasive. Michigan recognizes the rule against surplusage as a canon of statutory interpretation. The Michigan Supreme Court has stated that "every word of a statute should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible." Pittsfield Charter Township v. Washtenaw County, 468 Mich. 702, 714 (2003). When a dealer purchases a vehicle from a manufacturer or distributor it has two options. It can purchase the vehicle on credit or it can buy it outright. In other words, these two alternatives represent the entire field of options open to a dealer. If, as BRP suggests, the 120 day limitation were applied to both credit and non-credit purchases, the statute's specification of these two types of purchases becomes surplus.[6] In order to give meaning to the phrase "and drafted on the dealer's financing source or paid for," the 120 day limitation must only be applied to noncurrent models owned outright by the dealer and not to those that are financed at the termination of a dealer agreement.

BRP asserts that, for a manufacturer, it makes no difference whether a dealer purchases a noncurrent model outright or financed the purchase. In either case, it must

---

[6]Under BRP's interpretation, there is no difference between the following two statements:
(1) . . . provided the noncurrent model vehicles were purchased from the manufacturer or distributor within 120 days, and
(2) . . . provided the noncurrent model vehicles were purchased from the manufacturer or distributor and drafted on the dealer's financing source or paid for within 120 days.

10

repurchase a noncurrent model at the dealer's net acquisition cost even though it is outdated and worth less than its original price. BRP's argument is compelling in cases such as this where the dealer decides to terminate the agreement. It becomes even more compelling in situations where a dealer's inventory includes models that are several years old and have been subject to more substantial depreciation in value.

However, the Dealer Act was designed to address situations where the manufacturer – not the dealer – terminated the dealer agreement. The fact that it applies to all terminations and not just to those initiated by the manufacturer does not diminish the protectionist nature of the statute. The Michigan Court of Appeals has stated that the original Dealer Act, passed in 1979, "recognizes the economic disparity that usually exists between manufacturers and dealers of motor vehicles." Anderson's Vehicle Sales v. OMC-Lincoln, 93 Mich. App. 404, 409 (1979). The Court of Appeals further stated:

> Dealers are with few exceptions completely dependant upon the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer. . . . On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable. The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer."

Id. (quoting New Motor Vehicle Board of California v. Orrin W. Fox Co., 439 U.S. 96, 101 n.4 (1978)). Further, the 1983 amendment to the Dealer Act which added the repurchase requirement for noncurrent models was intended to provide additional protection for dealers in their interactions with manufacturers. See Senate Analysis Section, S.B. 206 (Third Analysis), Oct. 27, 1983. Because the Dealer Act was intended to protect dealers, an interpretation that provides such protection is more likely to be correct.

11

Bright notes in its brief that dealers who rely on credit to purchase vehicles face challenges that are not shared by dealers who are in a position to purchase vehicles outright. These dealers face increased default risks when a dealer agreement is terminated and may need additional protection in the face of a terminated dealer agreement. Bright states:

> Most dealers have millions of dollars worth of financial inventory. If the dealer defaults on such a large note with their finance company, the dealership and the guarantors are financially ruined and the finance company takes a huge hit as well. However, if the dealership actually owns the inventory free and clear, these concerns are non-existent. A manufacturer sits in a better position to repurchase and redistribute noncurrent inventory to its other dealers for sale to the public. A single terminated dealer can't redistribute the inventory anywhere.

Reply Brief of Plaintiff at 3, Bright Power Sports v. BRP US, Inc., No 09-11545. Bright's assertion underscores both the financial risks to dealers and their creditors as well as the difference between dealers who rely on credit and those who rely on cash to purchase their inventory. In light of these considerations, it is reasonable to find that the Michigan legislature was aware of the heightened risks faced by dealers who rely on financing and sought to provide them with additional protection through the amendments to the Dealer Act.

Thus, the Dealer Act's repurchase provisions for noncurrent models applies to all vehicles financed and to all vehicles purchased free and clear within 120 days of the termination. This interpretation is supported by the plain language of the statute and is the only interpretation that gives meaning to each part of the statute. BRP is correct to assert that this interpretation shifts a significant amount of risk related to noncurrent inventory from

the dealer to the manufacturer.  However, the purpose of the Dealer Act was to shift some of the risk in a dealer agreement from the dealer to the manufacturer.

**2.**

In order to recover the net acquisition cost of the noncurrent model ATVs remaining in its inventory, Bright must meet all of the terms specified in the Dealer Act.

First, Bright must prove that the vehicles were not "materially altered, substantially damaged, or driven for more than 300 miles."  Although the parties do not appear to dispute this issue, Bright has not produced any evidence in support of this element.  Until Bright provides credible evidence of the condition of the ATVs or the parties stipulate to their condition, Bright cannot prevail on its motion.

Second, Bright must prove that the vehicles were purchased from BRP.  The parties do not dispute that BRP was the source of the ATV's.  Further, BRP's offer to repurchase the ATVs in question establishes that they were originally purchased by Bright from BRP.

Third, Bright must establish the date of the original purchases and whether they occurred within 120 days of the termination of the dealer agreement.  The inventory lists provided by both Bright and BRP establish that all of the ATVs in question were purchased between October 26, 2007 and April 28, 2008.  Thus all of the ATVs were purchased more than 120 days before the date of termination.

Finally, BRP must prove that the ATVs were purchased on credit because they were not purchased within 120 days of termination.  There is no dispute in this case that the vehicles were drafted on Bright's financing source when they were purchased from BRP.  BRP states in its brief that "[i]t is undisputed that all of the units that are at issue in this case were drafted on Plaintiff Bright Powersports financing source prior to June 1, 2008.

13

Based on the record before the Court, Bright has met all of the elements required by the Dealer Act for the repurchase of noncurrent models except for the condition of the ATVs.  If Bright produces evidence demonstrating the "new" condition of the ATVs as required by the Dealer Act, BRP must repurchase them at Bright's net acquisition cost.

## V.  CONCLUSION

For the reasons stated above, Bright's motion is DENIED without prejudice with respect to the condition of ATVs in its inventory at the time termination and GRANTED on all other issues.  BRP's motion is DENIED.  Either party may file a subsequent motion for summary judgment addressing the condition of the ATVs in Bright's inventory.

SO ORDERED.

    s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  November 25, 2009

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 25, 2009, by electronic and/or ordinary mail.

    s/LaShawn R. Saulsberry
Case Manager, (313) 234-5160